## Butler v. Roberson.

(Decided March 19, 1914.)

### Appeal from Pike Circuit Court.

1. Elections—Contested Elections—Practice When Judge Not Available to Act on Preliminary Motions.—When the petition, or any other pleading filed in a contested election case, is indefinite or uncertain or otherwise defective or insufficient, and a motion to make it more specific, or to cure other defect or error, is filed in due time in the clerk's office, if the judge be absent, it should be treated as having been filed in court; and the judge who first hears the case thereafter should at the first opportunity require the parties to conform their pleadings to the rules of practice in this class of cases, and in disposing of the case the court should only consider such grounds of contest and counter-contest as have been made to conform to these rules.

2. Elections—Causes for Which May Be Declared Void.—Under Section 1596a of the statute, when it appears that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the election should be declared void.

3. Elections—Bribery—When Election Will Not Be Set Aside for.
—An election will not be set aside for bribery if the votes in-
fluenced by this method, or its effect on the election generally
can be eliminated and the result declared by casting up the votes
that were legally polled and that were uninfluenced by bribery.

4. Elections—Statutory Conditions That Authorize Elections To Be
Set Aside.—Under Section 1596a, the conditions that authorize
an election to be declared void may be brought about by fraud
or intimidation or bribery or violence, when the existence of any
one or all of these unlawful things appear to such an extent as
to justify the conviction that the election was so dominated by
their influence as to make it reasonably certain that these forces
had a controlling effect in giving to the successful party the
majority he received.

5. Elections—Bribery—Circumstantial Evidence.—Direct evidence
of bribery in elections is not required to enable the court to
take cognizance of the existence of bribery, as bribery may be
shown by circumstantial as well as by direct evidence.

6. Elections—Bribery—Circumstantial Evidence.—When there is
evidence that men known to be active election workers are
present with money at the place of election and that persons
known to be purchasable voters are also present, and these
people are seen together under circumstances that would create
the reasonable belief that money was being paid and received
or promised, a strong inference of bribery arises and slight
additional circumstances will establish its existence.

7. Elections—Bribery—Tracing of Money to Candidates.—It is not
necessary that the improper use of money should be traced di-
rectly to the candidates for office. The position or personality
or connection with the election of the person using money is of
minor importance compared with the fact of its use.

8. Elections—Bribery—Amount of Money Used Not So Important.—
The amount of money used to corrupt an election is not neces-
sarily a controlling factor in determining whether the election
should be set aside on account of the bribery practiced. It is
the wholesale use of money for this purpose, rather than the
amount of it, that should be looked to in determining the course
to be taken.

9. Elections—Bribery.—The fact that the evidence does not show
bribery sufficient in volume at any precinct to justify throwing
out any precinct, does not furnish a reason why the election
should not be set aside on account of bribery when it appears
that in a great many precincts a number of voters, largely in
excess of the majority received by the successful candidate, were
bribed.

O'REAR & WILLIAMS, SAM M. WILSON, M. C. KIRK and
J. J. MOORE for appellant.

HOBSON & HOBSON, E. D. STEPHENSON and WILLIS STA-
TON for appellee.

Opinion of the Court by Judge Carroll—Affirming.

At the November election, 1912, the appellant, Butler, and the appellee, Roberson, were the contending candidates for the office of circuit judge in the 35th judicial district, composed of the counties of Pike and Letcher, Roberson being the Democratic candidate and Butler the Republican candidate for this office.

Upon a canvass of the returns of the election by the the board of election commissioners, it was ascertained and determined that Butler had received 4,055 votes and Roberson 3,930 votes, thus giving Butler a majority on the face of the returns of 125 votes, and thereafter, on November 25th, the State Election Commissioners awarded to Butler the certificate of election.

Within the time allowed by the statute for contesting elections, Roberson filed in the Pike Circuit Court his petition in equity, in which he set out that he received a majority of the legal votes cast at the election and was entitled to the certificate of election and the office; that a large number of votes, certified as having been received by Butler, were procured by fraud, intimidation and bribery, and by the voting of persons who were non-residents of this State, and persons who had not resided in the precinct, where they were allowed to vote, sixty days before the election, and persons who were not twenty-one years of age when they voted, and persons who had been convicted of a felony and not pardoned.

That the election officers in various precincts permitted persons to vote openly without being sworn as to their inability to mark their ballots in secret, and in other precincts instructed the voters openly how to mark their ballots without ascertaining, as required by law, their inability to mark their ballots without being instructed. That the election officers in other precincts allowed supporters of defendant to accompany voters into the voting booths to watch the voters mark their ballots; that the election officers in certain precincts made mistakes in counting the ballots cast for plaintiff and defendant; and in other precincts the election officers kept the polls open beyond the time prescribed by law and permitted persons to vote for defendant when the polls should have been closed; and in yet other precincts persons, who had been convicted of felony and not pardoned, voted for Butler.

In short, elaborate charges were freely made that in a large number of precincts, which were named, one or more of all the offenses against the election laws were committed, and the number of persons who voted illegally in each of these named precincts was given, but not the names of any voters.

The prayer of the petition was for a recount of the ballots in certain named precincts; that the questioned, rejected and spoiled ballots not counted for Roberson be added to his votes; that the illegal votes cast for Butler be deducted from his votes, and that Roberson be adjudged to have received a majority of the legal votes; or, if this could not be done, that the court adjudge the election void.

On December 28th Butler filed in the clerk's office of the Pike Circuit Court a motion to require the plaintiff to make more specific his petition by giving the names of the persons alleged to have been bribed, or who exposed their ballots, or who were not old enough to vote, or who voted openly without being sworn, or who had been convicted of a felony and not pardoned, or whose ballots were wrongfully marked by the election officers. But on account of the absence of a circuit judge the motion to make the petition more specific could not be acted on, and so, on January 7, 1913, Butler, without waiving his motion to require Roberson to make his petition more specific, filed his answer and counterclaim. The first and second paragraphs of this pleading contained a denial of the affirmative matter in the petition as amended.

In the third paragraph he specified precincts in which a number of persons, some of whose names were given, were allowed to vote for Roberson, and averred that each of the persons so named was, for the reasons stated, not entitled to vote. He also averred that a number of unnamed persons were illegally permitted to vote for Roberson.

On January 16, 1913, Roberson filed a reply to the answer and counterclaim of Butler, in which he denied in substance any knowledge or belief as to whether the persons named in the answer and counterclaim voted for him.

In June, 1913, Butler withdrew his motion filed in the clerk's office in due time to strike from the files an amended petition of Roberson and also his motion filed in the clerk's office in due time to make the petition of Roberson more specific and certain, neither of which

motions had been acted upon on account of the inability to get a circuit judge. It also appears that the parties agreed to extend the time beyond the statutory limit in which evidence might be taken.

After these motions and agreements had been made, other pleadings, reiterating the charges of wrongdoing contained in the former pleadings, were filed, and in these pleadings apparently new grounds of contest and counter-contest were set up.

But all these irregularities in the practice and procedure were waived by the parties, and neither of them is attempting in this court to take any advantage of the failure to observe the requirements of the statute, or the rules of procedure that control the practice in cases like this.

As a result of all these agreements and withdrawals of proper motions, it is doubtful if there has ever come to this court a contested election case in which the statute law regulating contested elections and the rules of procedure as laid down by this court in respect thereto, have been so little regarded. Although the initial petition of Roberson was filed about 50 days after the election and nearly 30 days after the certificate was issued, it did not give the name of a single person whose vote was illegally cast or counted for Butler, and the counterclaim of Butler, filed a few days thereafter, only furnished the names of a few persons who cast illegal votes for Roberson, although general charges were made that many persons not entitled to vote had voted for him. Nor did the amended pleadings, filed by both of the parties months after the election, and after much of the evidence had been taken, pretend to give the names of more than a few of the large number of persons charged to have illegally voted.

It is, however, proper to say that an excuse for this irregular procedure is furnished by the fact that a circuit judge could not be secured when motions were made to conform the pleadings to the practice, and on account of this condition the parties felt constrained to waive or withdraw motions to make more specific and definite, and other motions that should have been sustained.

But to avoid a repetition of this loose practice that may arise in some other case where the absence of a judge prevents a speedy compliance with the rules of pleading applicable in this class of cases, we think that when the petition, or any other pleading, is indefinite

and uncertain, or otherwise defective or insufficient, and a motion to make it more specific or to cure other defect or error, is made and filed in due time in the clerk's office, if the judge be absent, it should be treated as having been filed in court as of the date it is filed in the office, and the judge who first hears the case thereafter should, at the first opportunity, whenever that may be, require the plaintiff to make his petition more specific and certain, or correct other errors therein, and the defendant to make his counter-contest more specific and certain, or correct other errors therein, if this should be done, and the motion to require these corrections has been made in due time and filed in the clerk's office.

In short, the parties should be required at the earliest available moment to conform their pleadings to the rules laid down in Weller v. Muenninghoff, 155 Ky., 77, and other cases, and when motions looking to the perfection of the pleading have been thus acted upon, the court, in disposing of the case, should only consider such grounds of contest and counter-contest as have been made to conform to these rules.

Coming now to take up the issues in the case, it appears that Hon. J. R. Layman, the judge who heard it, and evidently gave the record careful and full consideration, found as a matter of fact that after casting up the votes, Butler had a majority of 137, not taking into account the bribed vote; and, although counsel for Roberson insist that Butler's majority was only 87, we are disposed to accept, upon this question, the conclusion of the judge and leave the majority of Butler at 137.

Judge Layman, however, after thus finding that Butler had a majority of the votes reached the conclusion that the evidence of bribery was sufficient to justify him in declaring the election void, and he so ordered.

Looking at the case from this view-point alone, we will confine this opinion to a consideration of the question whether the evidence of bribery is sufficient to warrant us in holding the election void at which the contestee received, after deducting all illegal votes excluding bribed votes, a majority of 137.

Section 1596a, of the Kentucky Statutes, provides that "In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to

revision by appeal, or the Court of Appeals finally may adjudge that there has been no election. In such event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify.''

It will be observed that this section of the statute confers this large power on the court when it appears that the election has been so permeated with fraud, intimidation, bribery or violence as to show that neither of the contending parties could have been fairly elected. Under this statute the conditions that authorize an election to be declared void may be brought about by fraud, or intimidation or bribery or violence, when the existence of any one or all of these unlawful things, appears to such an extent as to justify the conviction that the election was so dominated by their influence as to make it reasonably certain that these forces had a controlling effect in giving to the successful party on the face of the returns the majority he received. And as we will presently show, this court has uniformly held that the election should be set aside when it is so permeated by these vicious agencies, or one of them, that it cannot be determined who received a majority of the legal votes cast, or it appears that the votes secured by either of these methods cannot be eliminated and the result ascertained.

In this case, however, the judge of the lower court put his decision distinctly upon the ground that the election should be declared void on account of the bribery that was practiced, and a careful examination of the record and the briefs of counsel satisfies us that if the election is to be declared void it must be for this cause.

It is true there is some evidence of fraud in a few precincts using the word fraud as distinct from the word bribery, but there is not sufficient to set aside the election upon this ground. Nor is there any substantial or material evidence of violence or intimidation in connection with the election. Indeed, the election, considering the circumstances surrounding it, was singularly free from acts of violence or intimidation. There was here and there an occasional individual act of violence and an occasional individual act of intimidation, but the violence and intimidation practiced affected few if any, of the votes that were cast or offered to be cast.

Before, however, taking up the evidence on the subject of bribery, it may be well to notice the cases decided by this court in which the statute under consideration

has been invoked and applied, for the purpose of pointing out the construction that has been placed on it by this court, so that we may view the evidence in the light of this construction and reach a conclusion in harmony with the adjudged cases.

In Stewart v. Rose, 24 Ky. L. R., 1759, the court said: "It is not every act of violence, fraud, or even bribery, that will vitiate an election. Such things, where their effect can be measured with any degree of certainty, will, in a contest involving the result of the election, be eliminated, and the result declared from what remains, if it can be done. So long as existing conditions continue it may be impossible to conduct elections without some unlawfulness on the part of some one, officers or voters or meddlers. It obviously would not do to say that in every such case the election will be void. But where the illegal voting, the bribery or fraud or intimidation has prevailed so that its effect upon the result is such that no degree of certainty exists as to the fairly-expressed will of the electors, the election should be declared void."

In Motley v. Wilson, 26 Ky. L. R., 1011, the court said: "There are usually irregularities in all elections, and, as a general rule, the misconduct of the election officers will not vitiate an election unless it is shown that the result was thereby affected. The true policy of the law is to sustain elections, and they will not be set aside on the ground of fraud unless the facts are such as to definitely show that there has been such fraud in the conduct of the election that neither candidate can be adjudged to have been fairly elected. To set aside an election is to deprive all the voters who voted at that election of their ballot, and it is to deprive the person who is successful at the election of the office which he won. The result, therefore, of the election should not be lightly set aside."

In Scholl v. Bell, 125 Ky., 750, it was said: "To set aside an election under this statute, two conditions should exist: First, the result must have been affected; and, second, the affecting element must have been fraud, intimidation, bribery, or violence. The contestee's participation in, or knowledge of, the fraud or other wrongdoing, does not have to be shown in order to set aside the election. It may be set aside, even though the contestee was entirely innocent of any knowledge thereof. * * * The contestant need not show that he would have been elected, except for the fraud. He need only

show that the fraud, intimidation, bribery, or violence existed to such an extent that it cannot be determined who was elected. The true test by which to determine whether, under the principles just announced, the result has been affected in an election—where there has been a fraudulent disfranchisement of voters—is not, would the result have been changed but for the disfranchisement? But, can the court, upon the whole record, determine with reasonable certainty that either the contestant or contestee was fairly elected?''

In Harrison v. Stroud, 129 Ky., 193, it was said: ''While it is the general rule, and a good one, that irregularities, the result of which upon the election can be shown with reasonable certainty to have been not prejudicial, may be disregarded, and the result of legal votes cast in the manner authorized by law be allowed to stand, yet when such irregularities are so widespread or general as to leave the judicial mind in doubt as to how the election did go, or would have gone but for them, then they cannot be eliminated.''

In Ford v. Hopkins, 141 Ky., 181, the court said: ''It is true, the courts are disposed as far as possible, to uphold popular elections and not to set them aside for light and trivial causes, if it can be fairly ascertained that the fraud or irregularities occurring did not affect the result. In other words, if it can be ascertained with reasonable clearness that a majority of the legal votes have been cast for the apparently prevailing party, the election will not be disturbed for mere irregularities or sporadic frauds which do not affect the result. But in this case no fair and impartial mind, after reading the record, can say with any reasonable certainty which side received a majority of the legal votes cast.''

In Skain v. Milward, 138 Ky., 200; and Stewart v. Wurts, 143 Ky., 39, the court said: ''The presumption is that the election officers did their duty that the election was properly held, and that the official count gives properly the result. The burden of proof is on the contestant to show such fraud, intimidation, bribery, or violence in the conduct of the election that neither the contestant nor contestee can be adjudged to have been fairly elected. These things are not presumed, but it must be affirmatively shown, not only that they existed, but that they affected the result to such an extent that it cannot be reasonably determined who was elected.''

In Hill v. Motley, 142 Ky., 385, the court said: "It is not sufficient to show that the election might have been affected by fraud; it must affirmatively appear that it was so affected."

In Young v. Roberts, 143 Ky., 511, the court said: "The receiving of illegal votes will not alone vitiate an election; it must be shown affirmatively, in order to overturn the declared result, that the wrongful act changed it."

It will be observed running through all these opinions, that the court, while condemning fraud, violence, intimidation and bribery, has been careful to say that an election will not be set aside on account of the existence of either or all of these unlawful things in its conduct, if the votes influenced by one or all of them, or the effect on the election generally of either one or all of them can be fairly eliminated and the result declared by casting up the votes legally polled and that were uninfluenced by these agencies. On the other hand, the court has been equally plain in saying that when the bribery, fraud, intimidation or violence has prevailed to such an extent as that its effect upon the result cannot be determined by any reasonable method of subtraction or elimination, the election should be declared void.

Guided by these rules, we will now endeavor to point out from the evidence a few of the many typical examples of bribery in this election that convince us that the election as a whole was so affected by this vicious influence as that the votes controlled thereby cannot be eliminated or it be ascertained, with any reasonable degree of certainty, who received a majority of the legal votes that were cast, and by legal votes we mean votes uninfluenced by bribery.

In Shelby precinct there were 50 to 60 "floaters," and the testimony conduces to show that about 30 of these voters received money for their votes. H. G. Casebolt testified that he saw money in the hands of election workers, but he refused to answer a number of questions that were asked him, in an effort to discover how many votes he had bought, upon the ground that his answers would incriminate him. Another witness, Pres Newsum, who used money at this precinct also declined to answer questions showing how many votes he bought, because his answers might incriminate him. He was asked this question: "State whether or not you did not tell some of the boys you talked to that the men you

have just named would see that they got their's after they had voted right, or words that would convey that same impression? A. Yes, sir; I think I did to some fellows, and the answer they would make me was that they could get ten dollars to vote for Roberson."

The evidence of W. H. May, another Butler worker in this precinct, illustrates very well the conditions there. He was asked if it was not a fact that votes were going at from five to ten dollars and answered: "I don't know. I didn't inquire into it. I heard John A. Bentley say he gave Harmon Adams $20 to vote for Roberson. I stood out of the ropes and heard Adams tell the election officers that he wanted to vote for Roberson, and they recorded his vote accordingly. Afterwards I throwed it up to Mr. Adams about selling his vote for $20 on the election grounds. He asked me for a ginger cake and I told him to take the money he got for his vote and go buy one."

At Lick precinct the evidence shows that there are about 75 "floaters" and that some 50 of these got money for their votes. W. L. Hackney, one of the vote buyers at this precinct, admitted he had money, but declined to say how many votes he bought, on the ground that it might incriminate him. And Henderson Hackney, another vote buyer, said in substance the same thing.

At Peters precinct, there are about 150 "floaters," and it appears that they were paid two dollars a vote. The system there was for the election workers to give these "floaters" pieces of cork, as some of the witnesses called it, and the voters would take this piece of cork to a room nearby, occupied by a man named Wolford, and get the promised money. Dodson and Blankenship distributed a good many of these corks, but they declined to go into details for fear their evidence might incriminate them. But Dodson, when asked "From your personal knowledge of the voters in this precinct, are there many men who will sell their votes?" said, "Yes; there are a heap of them that will take money."

At Upper Elkhorn precinct the evidence shows that before the election John M. Johnson got a roll of money in small bills at Butler's office for use in this precinct, and gave it to election workers. W. O. Wright says he had about a hundred dollars, but declined to say how many votes he bought for fear it might incriminate him. And further evidence shows that both the Democrats and Republicans had money in this precinct.

At Forks precinct John Ford, an election worker for Butler, and who used money in purchasing votes, did not seem to be either embarrassed or afraid to incriminate himself, and so he testified that he bought about twenty votes that cost some six or seven dollars apiece. The evidence concerning this precinct further shows that Clarence Polly and other workers had money there and that there are 70 or 80 purchasable votes in the precinct. And other testimony was to the effect that the average of the voters was five dollars apiece.

I. B. Sanders, one of the witnesses, in describing the method pursued, said: "Well, we generally have one man who holds the funds. We call him the stakeholder, and the others we call hustlers, who hustle them in and bring them into the stakeholder and use all of their power and influence to get votes for the man of the worker's choice. As a general thing they use any kind of means they can think of to induce him to vote. At least I did, honest or dishonest. It is very customary for a worker to bribe voters and to promise to give them as much as the other man will give them or more."

In Caney precinct Roberson and Butler had about an equal amount of money, each some two hundred dollars. The evidence shows pretty clearly that there is a large number of "floaters" in this precinct and that a good many of them were bought, but how many is not disclosed, because the witnesses declined to answer, on the ground that it might incriminate them. In Coal Run precinct J. F. Weddington gave two hundred dollars to the election workers, and Roberson's workers had about the same amount of money. The evidence shows that in this precinct there are a hundred or more "floaters," but they were not so high-priced as in other precincts and sold their votes at from one to two dollars.

In North Pikeville precinct there were "floaters" and money but how many votes were bought could not be ascertained because the witnesses declined to answer, on the ground that it might incriminate them.

In Brushy precinct the evidence shows that Roberson had about twice as much money as Butler. Basil Blackburn, in describing conditions at this precinct, said: "There was money on both sides. I was for the Republican ticket and Butler. The Republican side tried to buy some men and they bid plum over them on the other side and we could not get but a few." The evidence here

shows with some certainty that there was as many as 15 votes bought.

In Freeburn precinct there were also "floaters" and money, and some 50 votes were sold and bought. In Hellier precinct there was money on both sides, and one witness said that Roberson had five dollars to Butler's one.

In Fords Branch precinct there was likewise plenty of money and plenty of "floaters," and votes were selling at a good price. One witness says that "some of the boys got five dollars a head." In Jenkins precinct and in Line Fork precinct there were also vote sellers and vote buyers.

It appears to us unnecessary to extend this opinion further in illustrating by proven examples the shameful debauchery of the elective franchise that was practiced by the supporters of both Butler and Roberson in every precinct in this district in which there were purchasable votes. It is apparent from the record that each side used all the money available and were active contenders in the market for all the votes that could be bought, and there was a market in nearly one-half of the precincts in the district.

It is true that it cannot be gathered from the record the exact number of voters that were bribed or the precise sum that was used to bribe each individual voter, as the instances are comparatively few in which the evidence shows the actual payment and reception of money; but positive evidence of these acts is not required to enable the court to take cognizance of the fact that much money was used and many voters influenced thereby in casting their votes. Bribery may be shown by circumstantial as well as by direct evidence. If this were not so, almost insurmountable obstacles would be placed in the way of ascertaining the extent to which money was used in elections for improper purposes, and in almost every case the court, although it might be satisfied from an inspection of the record that the election was dominated by this influence, would be unable to take effective action.

Bribery is usually a secret or at least a quiet transaction between the vote buyer and the vote seller and is seldom attended by conduct that would enable bystanders to know what was said or done or what was paid or agreed to be paid, but when there is evidence showing that men known to be active election workers are pres-

ent with money at the place of election, and that persons known to be purchasable voters are also present, and the worker and the "floater" are seen together under circumstances that would reasonably create the belief that money was being promised or paid and received, a strong inference of bribery arises and slight additional circumstances will be sufficient to establish its existence, notwithstanding the fact that those directly concerned hide themselves behind the privilege that to tell the truth would incriminate them.

As has been remarked by this court in more than one case, there are few elections that are entirely free from improper methods on the part of candidates, election officers or voters. At some elections fraud is practiced; at others intimidation and violence are restored to; but at many more bribery is the means used to accomplish the desired end, and bribery is unquestionably the most dangerous as well as debasing enemy with which those who desire to secure fair elections have to contend. It embraces a wider field than intimidation, violence or even fraud, as these are usually confined to a few bad characters operating in a few precincts. It leaves, too, behind it a degraded manhood that is infinitely a heavier blow to the good citizenship of the community than are the frauds and violence sometimes resorted to by unscrupulous and disorderly persons to rob the electors of their choice. As said in Commonwealth v. Roberts, 145 Ky., 290:

"The bribe-taker, and the bribe-giver, in high and low places, are the greatest, most persistent and most insiduous foes that modern government has to contend with, for the evil effects of their corrupt bargaining impairs the strength and weakens the efficiency of every department of government that it touches. But at no place in our system is the vice of bribery so prevalent or its evil effects so pronounced as in the prolific field of popular elections. It is here that the widest opportunity for debauching the elector is afforded, and the prospect of discovery and punishment the least. In view of this lamentable condition everywhere existing, it needs no argument to show that the highest considerations of public policy demand that the statute protecting popular elections from the vice of bribery should be made as effective as possible."

Moved by the prevalence of this offense and its degrading influence upon the citizenship of the country,

this court, as well as all other courts, have not only denounced it in unmeasured terms, but have endeavored by all the means in their power to stop the corrupt use of money in elections by depriving candidates of the fruits of office sought to be obtained through means of this sort, when the evidence authorized it under the rules we have stated.

Nor is it necessary that the improper use of money should be traced directly to the candidates for office. The position or personality or connection with the election of the person using the money is of minor importance compared with the fact of its use. And it might be conceded in this case that if it were necessary to show that Butler himself secured and put in the hands of his election workers the money that was used in this election, the contest must fail, because there is no direct evidence tending to show that either Butler or Roberson in person used any money improperly. Indeed, the evidence is to the effect that they were both men of moderate means and did not and could not spend a great deal of their own money in this election, although there is abundant showing that their adherents had scattered throughout the district, in the various voting precincts where it could be used with effect, a considerable sum; just how much the evidence does not show, nor is it material that it should be shown.

The amount of money used to corrupt an election is not necessarily a controlling factor in determining whether the election should be set aside on account of the bribery practiced. It is the wholesale use of money for this purpose rather than the amount of it that should be looked to in determining the course to be taken. For example, in some counties and precincts a hundred dollars might secure a hundred votes at a dollar apiece, while in other counties and precincts where the voters placed a higher price on their elective franchise, it might cost a thousand dollars or even two thousand dollars to get this many votes, and so we do not attach much importance to the lack of direct evidence showing approximately the amount of money used in this election to bribe voters. But a careful reading of the record leaves the impression that out of the astounding number of saleable votes that were cast at this election, there were not many who did not get from one side or the other some compensation for their votes.

We do not, however, understand the argument of counsel for appellant to go to the extent of saying that money was not used in his behalf to corrupt the voters or that votes were not purchased in a number of precincts, but it is insisted that the evidence does not show bribery sufficient in volume at any precinct to justify us in discarding that precinct or throwing it out, and therefore as the election could not be declared void in any one precinct, it should not be declared void for the entire district. Although not agreeing to the statement of fact asserted there would be considerable force in this argument if the bribery was not widely distributed and did not affect many election precincts. But when it appears, as in this case, that in a great many precincts a number of voters have been bribed largely in excess of the majority received by the successful candidate on the face of the returns, it is not necessary that there should be evidence sufficient to declare the election void in any particular precinct. A rule like this would in effect deprive the courts of the authority in many cases to declare an election void on account of bribery, although the bribery practiced in many precincts was more than sufficient to reduce the majority of the successful candidates below the number of votes received by his competitor. It must also be apparent that a rule like this would have the effect of tolerating, if not authorizing, bribery in small quantities in many precincts, and only condemning it when it could be shown that it was so prevalent in some particular precinct as to justify the court in throwing out that precinct. The statute does not mean this, nor will this court adopt this construction. In giving the statute effect, we will declare an election void when the bribery shown to exist in the election as a whole is of such controlling volume and extent that the votes affected thereby cannot be fairly eliminated from the legal vote and the result declared by casting up the votes after setting aside the bribed votes.

We fully appreciate that it is a serious matter to declare an election, held at the time fixed by law and under the forms of law, void, thereby annulling as of no effect the votes of great numbers of good citizens and entailing upon the district the necessity of having another election for this office. But it is more important that the integrity of elections should be preserved and the elective franchise protected than that any man or set of men should receive office, and however reluctant courts may

be to interfere with the result of elections as declared by the officers charged with the performance of this task, it is, nevertheless, their duty, imposed by the statute, to declare void elections when it appears in a satisfactory way that it cannot be reasonably determined which of the candidates received the highest number of legal votes cast, and this duty they are not at liberty to evade or ignore.

There are undoubtedly thousands of honest, upright men and voters in this district who voted at this election for one or the other of these candidates, but which one of these candidates received the support of the majority of this class of voters, we have no means of knowing. It is equally as probable that Butler received a majority of this vote as that Roberson received it, but there is no way to get at the truth of it.

It is also undoubtedly true that hundreds of bought votes were cast at the election, some for Butler and some for Roberson, and they were counted as cast, although they should not have been counted at all, for a bribed vote is no vote. Just how many of these bribed votes were cast and counted for Butler, or how many were cast and counted for Roberson, we cannot say. It is impossible to eliminate the bad from the good.

Under the circumstances, our duty is to set aside the election and give the honest voters in the district an opportunity to select a judge of their choice at another election.

The judgment of the lower court is affirmed; whole court sitting.