## Beauchamp v. Willis.

Oct. 19, 1945.

Eli H. Brown, III, James W. Stites, and W. S. Heidenberg for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

In the recent primary, parties were Democratic candidates for the nomination to the office of County Judge of Jefferson County. The certified result showed that appellee had received 13,373 and appellant 12,185 votes cast in this race. In due time appellant filed petition contesting the nomination. It was charged that more than 988 votes (appellee's majority) should be deducted as illegal and fraudulent, because ballots were cast and counted in cases where the voter had not actually voted; in writing into the comparative signature book names of voters who did not appear at the polls; in the forgery by election officers, or persons known to them, of the names of persons not voting, but whose names appeared on the signature book, and issuing ballots not cast by the voter, but by others or the election officers. Also by failing to compare signatures of and issuing ballots to voters before they had complied with the applicable law, and in allowing repeaters to vote. Because of these frauds and irregularities it is charged more than 3,000 illegal votes were cast and counted for appellee. There was a general charge that in other precincts than those named the election was illegally conducted.

It was charged that prior to the election the Democratic organization, acting through committees, publicly announced a slate of candidates for various offices, and that it supported such choices (one candidate for each of the 30 offices to be filled) and expended about $15,000, to secure their nominations. One of these was appellee. As a part of the organization's activities, it or its committee, each of the Democratic election officers in the county was paid one dollar (in a few cases more) of the

organization's funds, this in addition to compensation paid by the fiscal court, and it is charged that such arrangement and payment was known to and participated in by appellee, resulting in his violation of our Practices Act.

Appellee denied the allegations of the petition, then counterclaimed by setting out alleged fraudulent and illegal ballots cast by named voters in various precincts, counted and accredited to appellant, and asking that such be deducted from his vote. The court sat for a period of two weeks hearing proof on the issues, apparently, as suggested by the chancellor, permitting great latitude in the hearing of evidence, and conduct of the case. The court adjudged appellant's proof to be insufficient to justify the setting aside the election; not sufficient to declare appellant the nominee and dismissed the petition, when defendant, without offering evidence, moved to dismiss because of failure of proof.

A necessarily hasty observation of the mass of evidence shows little or no dispute as to major facts. There is some dispute as to whether or not appellee had knowledge of the admitted payments to officers. On this point, which we conceive to be a major one, if the acts were done without the knowledge, approval or ratification of appellee, he is not to be held guilty of violation of the Act. Veal v. Thompson, 287 Ky. 742, 155 S. W. 2d 214. It was testified that at various, and perhaps all meetings of the organization or its committees, those present were told that the Democratic officers in each precinct would be paid out of the organization's funds the sum of one dollar. A witness said that this statement was made at a meeting or at meetings which appellee attended. He says he attended one district meeting in the West End. He stated that if any such announcement was made he did not hear it, and that he had no knowledge of the proposal. Witness was frank enough to say that had he heard the announcement, or had known of the plan, he would not have protested, because he saw no wrong in the extra payment.

It was said in argument here that appellee is a man of good repute and high character. There is no question but that witnesses who testified as to appellee's presence at meetings, and the announcement, were also of

good repute, but this question which goes to the root of the alleged violation of the Practices Act was one for the trial court to determine, and he found that the proof failed to establish the fact that the promises or payments were with the knowledge of appellant. We see no valid reason for overthrowing the court's conclusion on this point. The chancellor correctly concluded that there was not in the instance charged a violation of the Act.

Counsel for appellant contends that payment of extra pay to officers was violative, and points to what we said in Taylor v. Neutzel, 220 Ky. 510, 295 S. W. 873, 882: "The custom has grown up in both parties of paying election officers a sum in addition to the legal compensation. This practice should not be countenanced by any political party." We also said that the practice of paying workers should be discouraged. Notwithstanding this forceful language, we know by review of numerous contest cases that the practices have continued and we are pointed to no case nor have we observed one where the court has held such payments to be violative of the Act, or sufficient to uphold a charge of fraud, unless it be shown that the money paid was used for corrupt purposes. Likewise we fail to find any case which holds that an additional payment to election officers, (absent fraud) either vitiated the election or nullified the vote cast by any voter. In fact we find here nothing more than assumptions that the extra pay had any ulterior influence.

The chancellor refers to the custom as unfortunate and improper, and to this court's suggestion of the impropriety, and our expressed belief that a sufficient number of patriotic citizens should be found to serve as officers without additional pay, and that the danger in the practice is that the money may be paid in the guise of employing workers, when in fact the purpose was to use it to influence voters. It is difficult to conceive that persons who had been selected by bi-partisan officers charged with the duty of choosing as election officers persons who are sober, temperate, discreet and of good demeanor (KRS sec. 116.080) would, or did in this case, select persons who would pledge their votes for one or two dollars, or use the money in an effort to corrupt voters, or practice frauds.

The court found from the proof that officers could not be procured without extra compensation, and it was necessary, due to existing conditions, to offer the extra pay. It was difficult to obtain persons for a one day job at prevailing prices. As a sidelight the court referred to the fact that appellant had joined with other candidates in submitting lists to the commissioners, and that one officer in each precinct was appointed from that list, and that the names in his list were the same as the names on the organization's list in each of the 576 precincts, excepting about 80.

We agree with what was said in the Neutzel case as to payment of officers and workers. The act of payment of extra compensation is not per se reprehensible, but because of opportunities and possibilities, and in case of paid workers especially, the probabilities, the practice should be discouraged. We recognized in the Neutzel case that the mere payment of officers was not sufficient ground to nullify an election, and suggested that the "laws regulating the expenditure of money in elections should be strictly enforced and strengthened by legislative action."

We come now to the charges of fraudulent and illegal voting, and the effect; whether such, undoubtedly occurring, were sufficient to justify the court in declaring that there was such fraud, intimidation, bribery or violence in the election that neither contestant or contestee may be adjudged to have been elected. KRS 122.-030. Counsel for appellant makes no contention that the 20 per cent rule should be applied, and stand finally on the ground that there was such general fraud that the election should be held void. At this point we may say that there was no showing of violence, intimidation or bribery, unless it be assumed that the payment to officers constituted bribery.

The contention is that there were forgeries on the voters' signature book (17 precincts in all), running from one in one precinct to 87 in another. This book is known as the "comparative book," and came into use under an amendment to Louisville's Registration Law in 1944, KRS 117.310, changing from the old card system. This section provides that before a voter may cast his vote, he shall sign his name on the signature book; the officers shall, and challengers may, compare the signature

with the signature on the precinct voter's register. If there be a doubt as to genuineness, the voter may otherwise satisfactorily establish his identity as the registrant. The chancellor concluded that the statute was directory, contrary to the insistence of appellant that it is mandatory. As we view the section, it would seem that it is intended to be mandatory as to preliminary signing by the voter.

There were more than 25,000 votes cast in this race, with a certified majority of 988 for contestee. The petition challenged about 1200 Democratic votes. The court found that in about 770 cases there was some dissimilarity in the signatures, in many cases due to causes other than alleged forgeries. About 200 persons filed affidavits to the effect that they did not vote, although their names appeared on the signature book. The court remarked that it was not made to appear that such ballots were cast, a fact which could have been ascertained by checking against the stub in the ballot book, except in precincts where voting machines were in use. Affidavits were filed to the effect that 111 persons had moved from precincts. It was also shown that in one precinct the voting machine showed more votes than the names on the signature book, where, as is testified, one Democratic officer had added ten names to the book, whether this was done by simply picking ten names out of the air, or by depending on memory and adding the names of persons who had voted and failed to sign, does not appear. In another precinct an officer testified that another officer indiscriminately wrote the names of voters in the signature book; handwriting experts introduced said that sixty or more of these were "forgeries."

What is considered by appellant as impressive evidence of fraud is that of experts introduced, one who, comparing the registration book with the signature book, said his belief was that 95 per cent of the challenged signatures were not written by the same person. This expert testimony was considerably shaken when appellee brought forward twelve persons whose signatures had been declared false by the experts, who said they had signed the signature book. In addition there were more than 300 affidavits filed which showed that affiants had legally voted, thus showing that the opinion testimony was not absolute or convincing. They admitted that their conclusions were not based on standards

usually adopted by experts in reaching conclusions as to authenticity of signatures; one of them testifying on cross-examination, basing his opinion on comparison of a single genuine with a challeged signature, said that he would be lucky if he "hit fifty per cent." It is significant that it was not shown, or attempted to be shown, how these, or for that matter any votes cast, were counted, whether for appellee or appellant, though we recognize the difficulty, and in some cases the impossibility of meeting the requirement.

The court found that there were affidavits establishing illegal voting in various precincts to the total of 335; about 222 of these showed that the affiant, or members of his family, did not vote, the remainder that the voter was not entitled to vote because of removal from the precinct. To these may be added the votes challenged because officers had added names to the comparative register so as to tally with the voting machine, used in some precincts, the 58 votes cast by persons not registered, and a few others. It is admitted by appellee that 311 of these challenged votes were questionable. Whether all these successfully challenged, and admittedly illegal votes, were from the precincts in which the court found irregularities, we cannot tell. Out of the 576 precincts the court found in one, gross irregularities. This was a precinct in the third ward where appellant received 28 and appellee 66 votes. The court found it impossible to determine who had received these challenged votes, or a majority, and disregarded the precinct. He also found irregularities in four other precincts. Whether he disregarded them or not is not clear. However, he found that by disregarding all, the effect would not deprive appellee of a fair majority. The court correctly admeasured the testimony in relation to the instances where the signatures were questioned, but allowing all proven illegal votes, appellee would still have a majority.

It is apparent that the court, under all the proof, could not apply the discretion rule, nor is it here relied upon, but appellant insists that fraud and irregularities shown bring the case within the rule applicable where fraud and irregularities are so general as to cast doubt on the result, and require the court to declare no election. This if done, as the chancellor points out, would disenfranchise a great number of voters and pay more heed

to the desire and rights of the candidate than to the rights of the electorate. Courts should proceed slowly and carefully in undertaking to declare an election void; it should not be done unless the evidence is such as to convince the court that there was general fraud or irregularity. Here the charges of fraud were limited to a few of the 576 precincts; the same is true as to such irregularities in other precincts that could hardly be classified as fraud. The established rule is that where, after giving the evidence of fraud (or irregularities) its fullest effect, and fraudulent or illegal votes may be eliminated, and the result of the election be fairly ascertained from votes which were regular or untainted, the court should not go to the extreme of declaring the election void. Ferguson v. Gregory, 216 Ky. 382, 287 S. W. 952; Butler v. Roberson, 158 Ky. 101, 164 S. W. 340; Caudill v. Stidham, 246 Ky. 174, 54 S. W. 2d 654; Watts v. Bowen, 250 Ky. 678, 63 S. W. 2d 917. The rule applies here.

While there are shown irregularities, and proof indicative of fraud in a limited number of precincts, there is not enough to justify the court in concluding that such were ''general'' to the extent that the election as a whole was tainted. We are, under well known rules, compelled to give weight to the finding of the trial court; we are authorized to reverse only if we entertain more than a doubt as to the correctness of his finding. A consideration of the record before us fails to create a doubt.

Judgment affirmed.

The whole court sitting; Judge Dawson not voting.