RENDERED: AUGUST 25, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2015-SC-000572-DGE

CHARLES HARDIN, M.D.                                  APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.          CASE NOS. 2015-CA-000305-MR, 2015-CA-000328,
AND 2015-CA-000332
MAGOFFIN CIRCUIT COURT NO. 14-CI-00371

JOHN MONTGOMERY, MAGOFFIN                              APPELLEES
COUNTY BOARD OF ELECTIONS, RENEE
ARNETT-SHEPHERD, MAGOFFIN COUNTY
CLERK, CARSON MONTGOMERY, IN HIS
OFFICIAL CAPACITY AS A MEMBER OF
THE MAGOFFIN COUNTY BOARD OF
ELECTIONS, SUSIE SALYER, IN HER
OFFICIAL CAPACITY AS A MEMBER OF
THE MAGOFFIN COUNTY BOARD OF
ELECTIONS, AND JUSTIN WILLIAMS, IN
HIS OFFICIAL CAPACITY AS A MEMBER
OF THE MAGOFFIN COUNTY BOARD OF
ELECTIONS

AND

## 2015-SC-000575-DGE

MAGOFFIN COUNTY BOARD OF ELECTIONS,                    APPELLANTS
RENEE ARNETT-SHEPHERD, MAGOFFIN
COUNTY CLERK, CARSON MONTGOMERY,
IN HIS OFFICIAL CAPACITY AS A MEMBER
OF THE MAGOFFIN COUNTY BOARD OF
ELECTIONS, SUSIE SALYER, IN HER
OFFICIAL CAPACITY AS A MEMBER OF THE
MAGOFFIN COUNTY BOARD OF ELECTIONS,
AND JUSTIN WILLIAMS, IN HIS OFFICIAL
CAPACITY AS A MEMBER OF THE
MAGOFFIN COUNTY BOARD OF ELECTIONS

JOHN MONTGOMERY AND                                                APPELLEES
CHARLES HARDIN, M.D.


**OPINION OF THE COURT BY JUSTICE VENTERS**

**REVERSING**


The Magoffin County Board of Elections (the Board) and its members in their official capacities (Carson Montgomery, Susie Salyer, and Justin Williams, and Magoffin County Clerk Renee Arnett–Shepherd), and Democratic candidate for judge executive Charles Hardin, referred to collectively as "Appellants," appeal from a decision of the Court of Appeals which affirmed the judgment of the Magoffin Circuit Court setting aside the results of the November 4, 2014 election for Magoffin County judge executive and declaring the office vacant. The officially-tabulated vote count revealed that Republican candidate, Appellee John Montgomery, lost the election to Hardin by a mere twenty-eight votes. Montgomery filed this action to challenge the election results.

Appellants contend (1) that the trial court and the Court of Appeals nullified the election on grounds that were not set forth in Montgomery's petition to challenge the election, and thus deprived them of fair notice of such grounds; (2) that contrary to the trial court's conclusions, the election was conducted in substantial compliance with the applicable election laws; (3) that any violations of applicable election laws that occurred in the election were *de*

*minimus* and had no impact on the result of the election; and (3) that

Montgomery's evidence was insufficient to prove the illegalities he alleged and

insufficient to prove that the result of the election was affected by any

irregularities and improprieties which may have occurred.

For the reasons stated below, we reverse the opinions of the lower courts.

Accordingly, we conclude that Appellant Hardin is entitled to occupy the office

of Magoffin County judge executive in accordance with the tabulated results of

the November 4, 2014 election.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the November 4, 2014, general election for the office of Magoffin

County judge executive, Republican candidate John Montgomery challenged

the incumbent, Democratic candidate Charles Hardin, M.D. The vote tallies

showed that of the 5,389 votes cast at the polls on election day, Montgomery

received 2,899 votes (53.8%) and Hardin received 2,490 votes (46.2%), a 409-

vote advantage for Montgomery. In contrast with that tally, Hardin received

791 (69%) of the 1,145 absentee votes that had been cast while Montgomery

received only 354 (31%), a 437-vote advantage in favor of Hardin. Added to the

---

[1] We are aware of the recent proceedings in the United States District Court for the Eastern District of Kentucky in which a jury returned verdicts convicting Magistrate Gary Risner, Tami Jo Risner, and Larry Shepherd, husband of Appellant Renee Arnett–Shepherd, of vote buying in connection with the 2014 election cycle, including the Magoffin County Judge Executive race which is the subject of this opinion. See Montgomery Brief, Appendix I (copy of the federal district court Indictment). Our analysis is properly limited to the evidence in the record before us. We cannot consider evidence that may have been available to federal prosecutors but was not presented in this action. The recent criminal convictions have no bearing upon the issues we address.

2

election day votes, this absentee vote advantage gave Hardin an overall 28 vote margin (3,281 to 3,253) of victory.

Pursuant to KRS 120.155, Montgomery filed a petition in the Magoffin Circuit Court to contest the election. He alleged that violations of the voting procedures detailed in KRS 117.225[2] and KRS 117.227[3] occurred on election day at twelve of Magoffin County's fourteen precincts; that violations of KRS 117.075 through KRS 117.088[4] occurred in the absentee balloting process in that absentee ballots were given to people who were ineligible to vote, absentee ballots of people who died were counted,[5] and other irregularities occurred affecting the fairness and equality of the election; and that vote buying occurred when supporters of Hardin exchanged consideration such as paving work, graveling, cash, and other incentives for votes in violation of KRS 121.055, a central component of the Corrupt Practices Act (KRS 120.015). A bench trial, which commenced on February 2, 2015, included testimony of twenty-seven witnesses presented by Montgomery and ten witnesses presented by Appellants, in addition to the documentary evidence.

In timely fashion, the trial court entered an extensive Findings of Fact, Conclusions of Law, and Judgment. Among other things, the court found that

---

[2] KRS 117.225 addresses voter identification and voter signature procedures.

[3] KRS 117.227 addresses confirmation of voter identity procedures.

[4] KRS 117.075 through KRS 117.088 prescribe absentee ballot protocols.

[5] Before the trial on Montgomery's petition, it was determined that the only allegedly dead absentee voter was, in fact, alive at the time of the election. Consequently, this allegation was dismissed before trial.

3

corrupt practices in violation of KRS 120.015 and KRS 121.055 had occurred in that gravel had been placed by county workers on private property shortly before the election, and that cash payments had been made or promised to four voters. The court also determined that statutory procedures for identifying voters at the polls and for assisting voters in need of help were not followed by election officers. The trial court also found that applications for absentee ballots were not properly filled out and that procedures for casting and counting of absentee ballots were not followed.

Ultimately, the trial court determined that none of the individual improprieties and irregularities, taken in isolation, were sufficient to overturn the election, but that based upon the totality of the circumstances, the election outcome was the result of "fraud and bribery" to the extent that neither contestant could be judged to have been fairly elected. Consequently, the trial court set aside the results of the election and declared the office of Magoffin County judge executive to be vacant pending a new election.

Hardin and the Board appealed to the Court of Appeals. Montgomery cross-appealed arguing that the trial court should have declared him to be the winner of the contest rather than deeming the office vacant.[6] A divided panel of the Court of Appeals concluded that the trial court's factual findings were supported by substantial evidence and that it had properly applied the

---

[6] The Court of Appeals failed to grant this relief and Montgomery did not petition for discretionary review of that decision. The propriety of that disposition is not before us in the present appeal.

applicable election law to those facts. It affirmed the annulment of the election and the trial court's judgment vacating the office pending a new election. We granted Appellants' motion for discretionary review.

## II. STANDARD OF REVIEW

In cases tried without a jury, the court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01; *McClendon v. Hodges*, 272 S.W.3d 188, 190 (Ky. 2008). A factual finding is not clearly erroneous if it is supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence . . . has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* at 354 (internal citations and quotations omitted).

We note at the outset that the detailed findings in the trial court's fifty-five page judgment are, for the most part, supported by the evidence presented at the trial and are not clearly erroneous. However, many of the "findings" are simply summaries of the witness's testimony with no determination of the verity of the testimony.[7] Our general agreement with trial court's fact findings

---

[7] Several of the more crucial findings of fact, in which verity issues are resolved, are contained under the heading "Conclusions of Law." We regard those verity determinations, consistent with their actual nature, as findings of fact rather than as conclusions of law.

is, however, marred with crucial exceptions where material facts are not supported by adequate evidence. Many of the trial court's findings concerning vote buying are not supported by substantial evidence, but are instead based upon speculation and conjecture. More importantly, we conclude that the trial court's ultimate finding that Hardin's victory was "the result of fraud and bribery" such that "neither contestant nor contestee can be judged to have been fairly elected" is clearly erroneous.

In contrast to the deference we accord to factual findings of the circuit court, its conclusions of law are subject to *de novo* review. *McClendon*, 272 S.W.3d at 190. As further discussed below, we diverge significantly from the conclusions of the trial court and the Court of Appeals in our determinations concerning the manner in which the applicable election law authorities interact with the circuit court's findings of fact.

In this vein, we begin our discussion by noting the extraordinarily high standard that we have established for setting aside an election. Over a century ago in *Stewart v. Wurts*, our predecessor court summarized this high standard and the justifications for it. The principles cited in *Stewart v. Wurts*, and set forth below, still serve as the polestar that guides our review of election contests.

> The burden of proof is on the contestants to show such fraud, intimidation, bribery, or violence in the conduct of election that neither the contestant nor the contestee can be adjudged to have been fairly elected. These things are not presumed. But it must be affirmatively shown, not only that they existed, but that they affected the result to such an extent that it cannot be reasonably determined who was elected. Elections are not lightly set aside.

6

They are the means provided by law for the expression of the will of the people. To set them aside unnecessarily would be to destroy that confidence in them which is essential. If often set aside they would be less attended; for the voters would await the next chance, and the election, instead of settling things, would be only the starting point for new controversies. Elections must be free and equal; but they cannot be free and equal unless supported by public confidence. When once the notion prevails that confidence cannot be placed in the stability of elections, their power and usefulness is destroyed.

135 S.W. 434, 439 (Ky. 1911) (quoting *Skain v. Milward*, 127 S.W. 773 (Ky. 1910)).

The application of these stringent standards, along with the other authorities we cite herein, placed the burden upon Montgomery to prove: 1) that the improprieties he alleged actually occurred *and* were significant enough to have affected the result; or 2) that the election was so corrupted by fraud, intimidation, and bribery that the vote tallies are substantively unreliable. For the reasons explained below, we are persuaded that Montgomery made neither showing, and the trial court and Court of Appeals were in error to conclude otherwise.

## III. LACK OF COMPLIANCE WITH STATUTORY TIMING REQUIREMENTS AND SPECIFICITY OF PLEADINGS

Appellants first contend that the trial court erred by permitting an extended period of time for proof-taking in violation of KRS 120.165(2),[8] and

---

[8] KRS 120.165(2) provides as follows:

> The evidence in chief for the contestant shall be completed within thirty (30) days after service of summons; the evidence for the contestee shall be completed within twenty-five (25) days after filing of answer, and

7

that by hearing evidence of alleged election law violations that were *not* specifically asserted in Montgomery's petition and basing its decision on that evidence, the trial court violated KRS 120.155's mandate that the initial petition contesting an election "shall state the grounds of the contest relied on, *and no other grounds shall afterwards be relied upon.*"[9] Appellants contend that the trial court's judgment should be set aside for those violations. We disagree.

For obvious reasons, challenges to the results of an election must be resolved as fast as possible, and by enacting KRS 120.165(2), the legislature put in place a pretrial procedure to achieve that goal. KRS 120.165(2) requires the contestant to complete his proof within thirty days after the service of summons unless the court finds "cause" to grant a reasonable extension. Appellants correctly assert that the trial court failed to make a specific finding of the "cause" that justified a prolonged election contest process.

---

evidence for contestant in rebuttal shall be completed within seven (7) days after the contestee has concluded; provided that for cause the court may grant a reasonable extension of time to either party.

[9] KRS 120.155 provides, in pertinent part:

The petition [to contest the election] shall be filed and process issued within thirty (30) days after the day of election; *it shall state the grounds of the contest relied on, and no other grounds shall afterwards be relied upon.* The contestee shall file an answer within twenty (20) days after the service of summons upon him. The answer may consist of a denial of the averments of the petition and may also set up grounds of contest against the contestant; *if grounds are so set up they shall be specifically pointed out and none other shall thereafter be relied upon by the party . . . .* (Emphasis added.)

8

Appellants also suggest that the additional time allowed by the trial court permitted Montgomery to undertake an extended "fishing expedition" to discover grounds for challenging the election not stated in the initial petition. We agree that the time line established by KRS 120.165 was not followed, but we are persuaded that the trial court did not err in permitting the parties additional time to conduct discovery. To satisfy the statutory text, the trial court should have made a formal written finding stating the "cause" for the timing deviation. Nevertheless, the statute plainly vests the trial court with discretion in the matter.

KRS 120.165(1) directs the trial court to "complete the case as soon as practicable." This case presented a complex set of facts which under any circumstances would be difficult to conclude expeditiously. We commend the trial court's effort to balance the competing goals of providing a thorough exposition of the facts within a reasonably brief timetable, and to conclude the action it with a final judgment in just seventy-seven days from the filing of the petition. We are convinced that this slight departure from the statutory timetable for presenting evidence, which would not have been avoided by an explicit finding of just cause, affords no basis for setting aside the trial court's judgment.

Appellants further contend that the trial court based its decision to set aside the election, in large part, upon evidence of irregularities which were not specifically pled or otherwise identified in the initial petition. Because the general allegations cited in the petition do not incorporate the deficiencies

9

relied upon by the trial court as the basis for its decision to void the election, Appellants contend they did not receive adequate notice of the factual issues being tried.

We need not address this issue in this opinion. Regardless of the adequacy of the notice afforded to Appellants and the sufficiency of Montgomery's petition, we conclude that Montgomery failed to present sufficient evidence to sustain the allegations which the trial court relied upon to nullify the election. The requisite specificity of a petition and the effect of a trial court's reliance upon allegations not alleged in the petition are issues we reserve for another day.

## IV. ALLEGED IRREGULARITIES IN ABSENTEE VOTING

A major aspect of Montgomery's election challenge and the trial court's decision to void the election arises from the alleged irregularities in the absentee voting. Because absentee voting is subject to rules not otherwise applicable to election day voting, we review separately the allegations affecting absentee votes.

> The right to vote by absentee ballot is a special privilege granted by the legislature, exercisable only under special and specified conditions to insure the secrecy of the ballot and the fairness of voting by persons in this class. The absentee vote is completely separable from the general vote. If the procedures for conducting this phase of the election are violated to such an extent that a substantial number of votes cannot properly be counted, regardless of the candidate for whom the votes were cast, then the entire absentee vote, as a unit and as in the case of a precinct, should be disregarded.

10

*Ragan v. Burnett*, 305 S.W.2d 759, 760 (Ky. 1957).

In *Warren v. Rayburn*, 267 S.W.2d 720, 721 (Ky. 1954), the Democratic candidate for county sheriff enjoyed a slim margin of victory over his Republican rival in the election day voting (2,414 to 3,286, or 57.65%) but garnered only 16 out of 197, or 8.1% of the absentee votes. In the same election, the incumbent Republican county clerk, who was primarily responsible for compliance with the absentee voting laws and had virtually exclusive control over the absentee voting process, won 60% of the election day balloting and more than 99% of the absentee ballots.

The trial court in *Warren* found that the county clerk had, contrary to statute but in accordance with a local custom, printed 600 ballots exclusively for use by absentee voters, resulting in a suspicious allocation of absentee votes. The use of improperly printed ballots was not properly documented. The trial court found, "If this latter is the correct reason then this disregard of the statute is responsible for much of the majority received by contestee in the absentee voting." *Id.* at 724. The trial court found a direct nexus linking the illegal procedures employed for handling absentee ballots to the great discrepancy in the results of the election day voting and the absentee balloting. That nexus persuaded our predecessor court to affirm the judgment voiding all absentee ballots cast in the election under review.

Montgomery, citing the discrepancy between the election day vote and absentee vote in his own election, asserted in his petition that the applicable absentee ballot statutes, KRS 117.075 through KRS 117.088, were violated by

11

election officials. For purposes of review, these alleged violations may be divided into three principal areas: the absentee ballot application process; the "in-house" absentee ballot voting process;[10] and the absentee ballot counting process. We begin with a discussion of the statistical anomalies as indicators of voting irregularity which have understandably raised concerns in this case, to determine if the holdings of *Ragan* and *Warren* are applicable.

## A. Statistical Anomalies

In setting aside the election results, the trial court and Court of Appeals emphasized the prominent difference in the absentee voting results and election day votes cast at the polls. Of the 6,534 votes counted in the election, 5,389 (82.5%) were cast at the polls on election day and 1,145 (17.5%) were absentee votes. Montgomery received about 54% (2,899) of the election day vote, but only 31% (354) of the absentee votes.

Montgomery's "election expert," Kim Geveden, a political consultant often associated with Democratic Party candidates, testified that under normal circumstances the absentee vote closely tracks the election day vote, with an expected 3% to 10% variance between a candidate's election day vote and his absentee ballot vote. Montgomery's variance, and correspondingly, Hardin's variance, was 23 percentage points. Geveden explained that such a wide variance is a potential indicator of misconduct. He also testified that the large

---

[10] "In-house" absentee voting refers to the voting which occurred at an absentee voting machine located in the offices of the Magoffin County Clerk and which was available for in-person voting during the period of October 20 to November 3, except for Sundays.

number of absentee votes cast relative to the total vote suggests that "some impropriety [was] involved, as there could not be a legitimate explanation for this voting."

Notwithstanding Geveden's opinion, our case law holds that a statistical anomaly in absentee voting is not alone sufficient grounds to set aside an election or to cast out of all the absentee ballots. *Arnett v. Hensley*, 425 S.W.2d 546, 553 (Ky. 1968) (The fact that a candidate received 50.6% of the votes cast at the polls but less than 24% of the absentee ballots "alone would not suffice to warrant rejection of all the absentee ballots, but it does arouse suspicion that all may not have been well."). It is reasonable to expect that any conditions or circumstances that may induce a voter to use the absentee voting process would normally fall proportionately on each candidate's voters. "In the absence of some plausible explanation, it would be supposed that the general ratio of voting as between poll voters and absentee voters would be more nearly equal." *Id.* at 553.

Casting an even broader shadow on the Magoffin County absentee voting was the evidence showing that the rate of absentee voting in Magoffin County's 2014 general election exceeded the rate of absentee voting in all of its surrounding counties. It also represented a substantial increase over the absentee voting in previous Magoffin County elections. Magoffin County voters cast more absentee ballots than any other county in Eastern Kentucky.

Appellants offered a number of factors to account for the statistical anomalies. They presented evidence showing that many residents of Magoffin

13

County work outside the county and vote absentee to avoid missing work. Many of the voters working outside the county are union members traditionally allied with Democratic Party politics, and thus their absentee ballots would correspondingly be skewed in favor of Democratic candidate Hardin, and against Montgomery, the Republican candidate.

Appellants also posit that Hardin, a medical doctor in Magoffin County for more than twenty years, has treated many of the elderly, disabled, and ill Magoffin County voters who vote in disproportionate numbers by absentee ballot, and, having an affinity for their doctor they cast a disproportionate share of votes for him, thus further skewing the absentee vote in Hardin's favor. Other testimony attributed the larger than normal voter turnout to strong interest by voters in a number of other races, including an enthusiastic Democratic challenger in the United States Senate race that garnered national attention and increased voter response. Appellants also offered evidence that the absentee vote totals in Magoffin County for 2014 were generally consistent with other non-presidential elections in that county.

We agree with the trial court's conclusion that the disproportionate result of the absentee vote count raises questions which cast suspicion on the integrity of the absentee voting. But questions and suspicion alone do not authorize a finding of fraud. Showing that the vote tally *looks* suspicious is not the same thing as proving the illegality of the votes tallied.

The reasonable suspicion raised by the observed anomalies justified further investigation to determine if any Magoffin County absentee votes were

14

fraudulent. It was incumbent upon Montgomery to present evidence to answer the questions and validate that suspicion. Evidence was available to do so. Every absentee ballot was cast in the name of a registered voter, any of which could have been consulted to determine the integrity of his or her absentee vote. Montgomery offered no evidence to validate his suspicion. Appellants offered plausible, if largely unconvincing, explanations to account for the statistical anomalies, but the burden of proving the claim was on Montgomery.

Because a statistical anomaly alone does not authorize the courts to disturb results of this election, other evidence of significant irregularities affecting those votes must be established. As further explained below, while deviations from proper election protocols occurred, the irregularities were not shown to have any nexus to the disproportionate vote count so as to bring this case within the scope of *Ragan* and *Warren*.

## B. Absentee Ballot Application Process

The evidence presented at trial disclosed several irregularities in the absentee ballot application process that were contrary to statutory and Kentucky Board of Elections protocols. These irregularities include the county clerk's acceptance of absentee voter applications without obtaining the applicant's social security number and phone number, where the voter would be on election day, and the identity of the person requesting the absentee ballot.

KRS 117.085 sets forth in extensive detail the statutory absentee ballot requirements. KRS 117.085(2) provides as follows:

15

> The clerk shall type the name of the voter permitted to vote by
> absentee ballot on the application form for that person's use and
> no other. The absentee ballot application form shall be in the form
> prescribed by the State Board of Elections . . . and shall contain
> the following information: name, residential address, precinct,
> party affiliation, statement of the reason the person cannot vote in
> person on election day, statement of where the voter shall be on
> election day, statement of compliance with residency requirements
> for voting in the precinct, and the voter's mailing address for an
> absentee ballot. The form shall be verified and signed by the voter.
> . . .

An examination of the text discloses that KRS 117.085(2) does not require the voter's telephone number or social security number. Nevertheless, the absentee ballot application form promulgated by the state Board of Elections provides spaces to record that information. The trial court found that of the 1,145 absentee ballot applications, 910 failed to record the voter's social security number; 463 failed to note the voter's telephone number; and 354 did not identify the place where the voter would be on election day. Eight of the 1,145 applications omitted the name of the person who made the request for the absentee ballot in violation of KRS 117.085(1).

Montgomery suggests that these deficiencies justify the disqualification of the affected absentee ballots. The first problem with his position is that no evidence indicates for which, if either, candidate the affected votes were cast. Even if we were to agree that the affected ballots should be invalidated, without knowing for whom those secret ballots were cast there is no way to make corresponding adjustments to the vote tallies. Once again, we note that none

16

of the voters associated with the deficient ballots were called to testify or otherwise attest to how they voted.

The trial court concluded that the failure to record the voter's social security number invalidated the application because "the Court is unable to review the validity of the applications in the absence of [the social security number.]" We disagree. The failure to obtain the voter's telephone number and social security number does not render the application invalid or illegal. As noted above KRS 117.085(2) does not direct the clerk or the election officials to obtain that information, and we are aware of no other law that does so. The name and address of the voter on the application provides adequate identifying information so the use of social security numbers and phone numbers is unnecessary.[11]

KRS 117.085(2) does require that the absentee ballot application identify where the person will be on election day. In addition, KRS 117.085(1) provides that "[t]he absentee ballot application may be requested by the voter or the spouse, parents, or children of the voter, but shall be restricted to the use of the voter." Unlike the social security and phone numbers, the voter's location on election day and the name of the person requesting the ballot are statutorily required, and thus those omissions represent a substantial deviation from the statutory procedures regarding applications for absentee ballots.

Traditionally, our analysis of election law violations and their effects

---

[11] The Magoffin County Clerk testified that the Board of Elections is in the process of phasing out the social security and phone number fields due to privacy concerns.

upon election results requires us to determine if the statutory requirement under review is directory or mandatory. Violations of directory requirements do not nullify the elections results, but violations of mandatory provisions may.

> [I]n order that the legal voter may be protected, and not disfranchised for the time being, by mere irregularities in the appointment of the election officers, or mere irregularities in the proceedings of the election officers, the statute authorizing their appointment and prescribing the manner in which they shall conduct the election must be construed to be directory merely, and not mandatory, unless such irregularities really affect the merits of the case, in which case the statute must be construed to be mandatory.

*Varney v. Justice*, 6 S.W. 457, 459 (Ky. 1888). A statutory requirement is "directory . . . if the directions given by the statute to accomplish a given end are violated, but the given end is in fact accomplished, without affecting the real merits of the case . . . ." *Id.*

The *Varney* doctrine requires us to engage in a practical view of election statutes and distinguish between mandatory, nondiscretionary provisions which are fatal to the election result (such as, for example, noncompliance with candidate residency requirements or disqualification of a candidate as a convicted felon or holding the election outside of the permissible election hours) and merely directory provisions which, even when violated, do not negate the election result.

"Whether a statute is to be deemed directory or mandatory depends, not on form, but on the legislative intent, which is to be ascertained by interpretation from consideration of the entire act, its nature and object, and

18

the consequence of construction one way or the other." *Skaggs v. Fyffe*, 98

S.W.2d 884, 886 (Ky. 1936). *Skaggs* further explains a statutory election

requirement will be regarded as directory "where compliance is a matter of

convenience or the directions are given merely with a view to securing proper,

orderly, or prompt procedure." *Id.*

> Provisions of election laws are all mandatory in the sense that they impose the duty of obedience on those who come within their purview, but it does not follow that every slight departure therefrom should vitiate the whole proceeding. If a statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, but does not declare or indicate that their performance is essential to the validity of the election, they will be regarded as directory if they do not affect the actual merits of the election.

*Id.*

*Skaggs* holds also that "laws are to be liberally construed when

necessary to reach a substantially correct result, to that end their provisions

will, to every reasonable extent, be treated as directory rather than mandatory."

*Id.* (citations omitted).

Our predecessor courts have generously applied the directory-mandatory

dichotomy in the context of absentee ballots:

> Through all the cases relating to absentee voting, the theme of *substantial compliance* with statutory regulations is omnipresent. The courts are reluctant to deprive a voter of his right of suffrage because of mere irregularities which do not affect the fairness and equality of an election. It is felt that a voter, through no fault on his own part, should not suffer the consequences of a minor failure on the part of election officials to follow the formal steps prescribed.

*Jarboe v. Smith*, 350 S.W.2d 490, 493 (Ky. 1961).

19

We are confident that the deficiencies identified by the trial court in failing to record the telephone number and social security number, which are not even statutorily required, and the violations in failing to record where the person would be on election day and who requested the absentee ballot fall well within the scope of directory requirements. By their nature, they are designed to facilitate absentee voting by providing election officials with statewide uniform directions for processing absentee voting. Compliance is not essential to the validity of a fair election and lack of compliance does not inherently produce an unfair election. The failure to conform to the directives of KRS 117.085(1) and KRS 117.085(2) do not invalidate the election except when it is shown that it actually affected the electoral outcome.

## C. *In-House Absentee Voting Process*

Montgomery also presented testimony concerning alleged irregularities relating to the "in-house" absentee process. In-house voting refers to the absentee voting which occurs in the weeks preceding an election, typically in the county court clerk's office. *See* KRS 117.085(1)(c).[12]

In this case, in-house voting began on October 20, 2014. KRS 117.085(1)(h) provides in pertinent part:

---

[12] KRS 117.085(1)(c) provides as follows:

> Absentee voting shall be conducted in the county clerk's office or other place designated by the county board of elections and approved by the State Board of Elections during normal business hours for at least the twelve (12) working days before the election. A county board of elections may permit absentee voting to be conducted on a voting machine for a period longer than the twelve (12) working days before the election.

The members of the county board of elections or their designees who provide equal representation of both political parties may serve as precinct election officers, without compensation, for all absentee voting performed on a voting machine in the county clerk's office or other place designated by the county board of elections and approved by the State Board of Elections. . . . If the members of the county board of elections or their designees do not serve as precinct election officers for the absentee voting, the county clerk or deputy county clerks shall supervise the absentee voting.

On October 17, 2014, the Republican member of the Magoffin County Board of Elections resigned and his successor was not named until October 24. Thus, from October 20 to October 24 no Republican board member served to function as an election official during the in-house voting although other board members were present for in-house voting. The trial court concluded that "the Defendant Magoffin County Board of Elections violated that provision of the statutes by allowing in-house absentee balloting to take place in the absence of the Republican election commissioner."

An examination of KRS 117.085(1)(h) discloses no requirement for each board member to be present at the in-house voting site. Rather, the statute provides that members serving as a political party representative "may" be present. In the absence of the member and his "designee," the statute provides that "the county clerk or deputy county clerks shall supervise the absentee voting."

In light of the evidence and the plain language of the statute, we determine that the trial court's conclusion that in-house absentee voting

21

conducted in the absence of a Republican board member violated KRS 117.085(1)(h) is clearly erroneous.

Montgomery also presented evidence showing violations of the statute authorizing election officers to render assistance to voters with special needs. KRS 117.255(3) provides:

> Upon making and filing the oath with the precinct clerk, the voter requiring assistance shall retire to the voting machine or ballot completion area with the precinct judges, and one (1) of the judges shall, in the presence of the other judge and the voter, operate the machine or complete the ballot as the voter directs. A voter requiring assistance in voting may, if he prefers, be assisted by a person of his own choice who is not an election officer, except that the voter's employer, an agent of the voter's employer, or an officer or agent of the voter's union shall not assist a voter.

The trial court found that the statute was violated when deputy county clerk Larry Shepherd and Democrat election commissioner (and Appellant) Susie Salyer on at least four occasions assisted voters in the voting booth with no one else present. We agree with the lower courts that these violations were not so widespread as to invalidate the entire absentee balloting process under the *Ragan-Warren* standard.

### D. Absentee Ballot Counting Process

The final step of the absentee balloting process is, of course, to count the ballots. The trial court found significant violations regarding the procedure employed for counting absentee ballots. KRS 117.087(1)-(7) provide a detailed protocol for the counting of the absentee ballots. KRS 117.087(3) includes the following statutory directives: the counting of the ballots is to begin at 10 a.m.

22

on election day[13]; the mailed ballots are to be removed from their boxes individually and examined to determine whether the outer and the detachable flap are in order; the signature on the detachable flap is then compared with the signature on the voter's registration card by the chairman of the county board, here county clerk Renee Arnett-Shepherd; any unsigned ballots must be summarily rejected; and if there is no challenge after the name of the voter is read aloud, the flap is to be removed and the inner envelope containing the actual ballot is to be placed in a ballot box.

After the above steps are concluded, KRS 117.087(5) provides thereafter that "the [ballot] box shall be thoroughly shaken to redistribute the absentee ballots in the box. The board shall open the ballot box, remove the absentee ballots from the inner envelopes, and count the ballots." In summary, the paper mail-in ballots are removed, counted, and the total from those ballots is then combined with the absentee ballots cast on the in-house voting machine to obtain the total absentee ballot results.

The evidence revealed several deviations from these statutory directives which the trial court enumerated in its findings of facts. The trial court found that the Board violated KRS 117.087 by failing to count the ballots one at a time and instead distributed the ballots among the board members present; by not having Arnett-Shepherd alone handle them; and by failing to shake the box to redistribute the absentee ballots. It is readily apparent to this Court that

---

[13] The statute has been subsequently amended was later amended to 8:00 a.m.

each of these violations concerned directory, rather than mandatory, requirements, and, as such, do not warrant disenfranchising any of the absentee voters. *Jarboe v. Smith*, 350 S.W.2d 490 (Ky. 1961) (absentee votes would not be invalidated by improper means employed to count the ballots where there was no attack upon the integrity of the absentee ballot box, nothing indicated that the count was not authentic and no one was willfully excluded after establishing his right to be present at the count, and no contention of fraud or deliberate wrongdoing was made). Republican election board member Pastor Williams was present at all times for the absentee ballot counting process and at trial, expressed his unqualified endorsement for the integrity of the count. We are unpersuaded that any of the deviations from the statutorily mandated procedures merit any concern for the integrity of the absentee ballot vote count.

### E. Summary

The evidence presented by Montgomery validated his claim that some irregularities occurred in the absentee voting process. However, none of the proven violations of the statutory requirements are linked to any invalid or illegal votes. We agree with the trial court's conclusion that "while substantial questions have been raised about the validity of the absentee ballots, the Court concludes that there is insufficient evidence to discard the entirety of the absentee ballots." *Ragan v. Burnett*, 305 S.W.2d 759 (Ky. 1957); *Warren v. Rayburn*, 267 S.W.2d 720 (Ky. 1954).

## V. VOTE BUYING ISSUES

Montgomery's petition alleged that vote buying occurred when "supporters of [Hardin] exchanged consideration such as paving work, graveling, cash, and other incentives for votes." In its final judgment, the trial court concluded that "the Corrupt Practices Act, KRS 120.015 was violated by the buying of votes by persons unknown"; by "gravel [ ] placed illegally upon private property on at least four or five occasions in a short period of time prior to the election"; and "by employees of the Magoffin County Fiscal Court, under the supervision of the Defendant Charles Hardin, in illegally placing gravel on private property."

KRS 121.055, a component of the Corrupt Practices Act, provides as follows:

> *No candidate* for nomination or election . . . *shall expend, pay, promise, loan or become liable in any way for money or other thing of value, either directly or indirectly, to any person in consideration of the vote or financial or moral support of that person.* No such candidate shall promise, agree or make a contract with any person to vote for or support any particular individual, thing or measure, in consideration for the vote or the financial or moral support of that person in any election . . . and no person shall require that any candidate make such a promise, agreement or contract.

(Emphasis added.)

"The purpose of the Corrupt Practices Act is to preserve the purity of elections, and . . . courts should lend a willing hand in its enforcement where the facts and circumstances justify it." *Humbert v. Heyburn*, 42 S.W.2d 538, 541 (Ky. 1931) (internal citation omitted). KRS 120.015 provides: "If no such

25

violation by the contestant, or by others in his behalf with his knowledge, appears, and it appears that such provisions have been violated by the contestee or by others in his behalf with his knowledge, the . . . election of the contestee shall be declared void."

## A. *Cash Payments*

Montgomery presented evidence suggesting that three voters, Jerry Adams, and the brothers Simon Marshall and Mickey Marshall, received cash payments for their votes on election day. None of the three can read or write, and, in addition, each suffers from a cognitive deficiency which presented each with substantial difficulties in testifying about the election day events. Montgomery also presented evidence that Doug and Brian Marshall voted with the expectation of being paid for their vote.

Jerry Adams first candidly testified that his cousin, Jason Holland, gave him $25.00 to vote for Hardin. He said that Holland handed him the money after he voted and that Holland got the money from someone driving a gray car at a grocery store. Adams testified that he voted for Hardin. However on cross-examination, Adams testified that the money may have been a payment for his share of scrap metal recycling transaction rather than a payment for his vote, and that it in any event, the payment did not influence how he voted. Holland was never called to testify.

Greg Isaac testified that he took Simon and Mickey Marshall, along with two other voters, to the Flat Fork precinct. Doug Perkins, the operator of a local convenience store, testified that Simon, a regular customer, entered the

store on election day with a $50.00 bill, and that it was unusual for Simon to have a bill of that denomination. Perkins testified that when he asked Simon where he got the bill, Simon laughed and replied, "It's election day," apparently implying that he had been paid fifty dollars for his vote. Simon, however, testified that neither he nor his brother were paid for their vote. Also, he never testified who he voted for in the judge executive race, although his transportation to the polls by Greg Isaac, a Hardin supporter, lends circumstantial support to the notion that he voted for Hardin.

Mickey Marshall, like Simon, testified that he was not paid for his vote and Montgomery presented no evidence to contradict that testimony. There was no evidence at all that Mickey was paid for his vote.

Montgomery presented witnesses who testified that two individuals, Doug and Brian Marshall, arrived at the Magoffin County courthouse after the polls closed on election day, looking for a representative of the Hardin campaign to compensate them for voting for Hardin. There was no evidence that either man was actually paid for his vote; nor was any evidence presented to show that anyone had offered compensation or agreed to pay compensation to the men. Notably, neither man was called as a witness to verify the account.

Despite his later recantation, Adams' initial testimony that he was paid for his vote, and the attendant circumstances, could induce a reasonable fact-finder to conclude that he was paid to vote for Hardin. However, we are constrained to conclude that the record lacks substantial evidence that Simon Marshall, Mickey Marshall, Doug Marshall, or Brian Marshall sold their votes,

or contracted with someone to sell their votes. Perkins' testimony about his interaction with Simon Marshall may lead one to suspect that someone paid Simon for his vote, but it falls far short of substantial evidence proving the fact. With respect to the other suspected vote sellers, only by pure conjecture and sheer speculation could one conclude that their votes in the county judge executive's race, if indeed they voted at all, were bought. The trial court's finding that the votes of Simon Marshall, Doug Marshall, and Brian Marshall were illegally bought is clearly erroneous.

### B. Graveling and Road Work

The trial court found that on at least four or five occasions just prior to the election gravel had been illegally placed on private property by employees of the Magoffin County Fiscal Court acting under the supervision of Judge Hardin. Consequently, the trial court "conclude[d] that the Corrupt Practices Act, KRS 120.015, was violated by employees of the Magoffin County Fiscal Court, under the supervision of Defendant Charles Hardin, in illegally placing gravel on private property."

Montgomery alleged at trial that Magoffin County Clerk Renee Arnett-Shepherd and her husband, Larry Shepherd, had received free gravel, repair of a drainage tile at the county's expense, and repair to a pipe bridge on their property, and that Kermit Howes and other residents of Dodson Branch Road had benefited from county work in advance of the election. Further evidence was presented that the beneficiaries of the alleged road, gravel, and drainage work supported Hardin.

28

Appellants denied that any party received any gratuitous work at county expense or as an election *quid pro quo.* They presented evidence that the drainage tile was installed by the county long before the Shepherds acquired the property, and that it was causing flooding in the area, prevention of which was a legitimate governmental purpose for the work. They also presented evidence that the graveled road led to a cemetery near the Shepherds' property and was part of the county road system in need of repair; and that any repair work on the pipe bridge, if done at all, was quickly abandoned and never completed.

At most, the evidence demonstrated that gravel was placed and work was done at county expense near and on private property, but no evidence supported a finding that the gravel and road work was payment exchanged for votes for Hardin or anyone else. Contrary to Montgomery's speculative evidence, the testimony of the property owners and the road crew personnel who performed the work affirmed that all the expenses incurred were either incidental to necessary county road work or the result of privately contracted work paid for by the owners.

This Court is well aware of the popular perception and common assumption in many areas that corrupt incumbents will provide favors at public expense in exchange for political support. We are not so naïve as to believe that such corruption does not occur. In many instances the mere suspicion of such wrongdoing, or simply perception of such wrongdoing, may be enough to justify some form of judicial response. But the power to nullify

29

an election and cast aside the apparent will of the people is a tremendous power that cannot be exercised on the basis of popular perception and common assumption supported only by evidence that arouses suspicion. One contesting an election has a heavy burden and the public has a right to demand substantial proof. Tolerating a lesser standard allows mere speculation and suspicion of political wrongdoing to become a presumption of electoral corruption. It is, of course, possible that the road work observed in close proximity to the election was a visible but tacit form of vote buying. But we cannot presume that to be so, especially given the plausible explanations provided by Appellants' evidence. Upon the record as a whole, the inference which leads to a conclusion of vote buying is no stronger than the inference which leads to a conclusion of that routine county road department work was performed in the normal course of business. "[B]efore a case is submitted to a jury on circumstantial evidence the proven facts must justify a fair inference of liability. An inference of liability is not a fair one if other inferences of non-liability are equally as reasonable." *Bryan v. Gilpin*, 282 S.W.2d 133, 135 (Ky. 1955).

We add to this point if we allow a presumption to persist that work on public roads in and around private property near election time signifies a corrupt practice in progress, then we effectively force municipal, county, and state road departments to cease operation for a reasonable time before and after the election to avoid appearances of impropriety. We avoid that dilemma by maintaining the requirement for substantial evidence.

30

## C. Summary

The trial court's findings with respect to vote buying involving Jerry
Adams are supported by substantial evidence, whereas the finding of vote
buying from Simon Marshall, Brian Marshall, and Doug Marshall is not so
supported.[14] While no evidence directly links the buying of Adams' vote to
Hardin, the circumstantial evidence permits the inference that he voted for
Hardin. The buying of Jerry Adams' vote is a corrupt practice condemned by
KRS 120.015, and thus we are constrained to hold that a deduction of one vote
from Hardin's vote tally is necessary.

Our predecessor court decreed in *Stewart v. Wurts*:

> However much we may deplore the improper use of money in
> elections, we cannot afford upon mere suspicion to declare an
> election void merely because money may have been appropriated
> for some sort of use therein; there must be in such case some
> tangible, positive proof that it was corruptly used in violation of
> law, to justify a court in declaring the election void.

135 S.W. at 439. As further explained in *Gross v. Cawood*,

> It has long been a rule of this court not to declare an election void and of
> no effect on account of a violation of the Corrupt Practice Act, except it
> be shown by unimpeachable evidence that the contestees violated the act
> itself, or that, with their knowledge, consent, or procurement, the act
> was violated by others for them.

109 S.W.2d 597, 598 (Ky. 1937) (citations omitted).

We are persuaded upon our review that there was no "unimpeachable
evidence that [Hardin] violated the act itself, or that, with [his] knowledge,

---

[14] The trial court made no finding with respect to vote buying involving Mickey
Marshall.

31

consent, or procurement, the act was violated by others for [him]" so as to authorize the nullification of the election under the Corrupt Practice Act. The evidence satisfactorily established only one vote that could be said with fair assurance to have been illegally bought, and that is well short of the number Montgomery needed to tie the election. As such, this violation of the Corrupt Practices Act, standing alone, is not sufficient to set aside the election; rather, at best, Hardin's margin of victory is reduced to twenty-seven.

## VI. CLAIMS OF DISCREPANCIES IN VOTER SIGNATURES

Montgomery introduced at the trial the testimony of Thomas Vastrick, an expert on handwriting analysis who had examined voter signatures on the election day voter roster at the Flat Fork precinct and on the absentee ballot materials. Vastrick opined that the signatures of forty-three Flat Fork voters did not match the corresponding signature on the voter's voter registration card; that fourteen voter signatures on voting precinct forms did not match, and that twenty-six voter signatures on the absentee ballots did not match the corresponding signature on the voter's absentee ballot application. The implication of his opinion is that eighty-three votes cast in the names of those voters were cast by imposters who forged the signatures of the registered voter.

Only two of the eighty-three voters were called as witnesses and both refuted the insinuated forgery. Both verified the authenticity of their signatures on the voting roster and attested to having personally cast the votes recorded in their names. One of the voters explained that her current signature might look different than the signature on her voter registration card

because the latter was signed thirty years prior, when she was eighteen, and the former was signed on election day. The other voter testified that he was left-handed, and because he had a broken left arm on election day he had to sign the voter roster with his right hand. None of the other voters whose election day signature was identified by Vasterick as suspect were called to testify. Montgomery's attempt to demonstrate that imposters cast ballots in place of legitimate registered voters by forging their signatures falls woefully short. Proving the suspected forgeries would have been relatively easy because the names and addresses of the eighty-three voters whose signatures were suspect were readily available.

Appellants refuted Vastrick's opinion with the countervailing analysis by their handwriting expert, Stephen Styler. Ultimately, Vastrick conceded that he used an unreliable method of handwriting comparison and could not definitively establish any forgeries. In this vein, our predecessor court has acknowledged that the comparison of a single signature with a challenged signature is not a reliable method to determine the authenticity of the signature in question. *Beauchamp v. Willis*, 189 S.W.2d 938, 941 (Ky. 1945).

With respect to the alleged voting by imposters, the trial court found that "[b]ased upon the evidence, the Court cannot find that any particular voter's signature was invalid, but does find that a question has been raised as to the validity of the signatures of an undetermined number of voters." The extent to which this mere raising of the question of the validity of voter signatures contributed to trial court's ultimate conclusion that the whole election was "the

33

result of fraud and bribery" is unclear. But under our prevailing standards, unconvincing and unproven allegations that merely raise questions cannot provide the basis for voiding the result of an election.

## VII.    ALLEGED IRREGULARITIES IN ELECTION DAY VOTING

Montgomery alleged and offered evidence to several other instances in which election officers failed to follow proper procedures, much of which concerned alleged irregularities at the Flat Fork precinct. The trial court and the Court of Appeals determined that the failure of election officers to follow the statutory directives cited by Montgomery was insufficient cause to cast out all of the votes in the Flat Fork precinct and, thereby, disfranchise the demonstrably valid votes of those who had no control over the diligence with which election officers performed their duties. We agree with that determination. We address the violations in the following paragraphs.

### A. *Failure of Election Officers to Comply with Voter Identification Procedures*

Montgomery's petition specifically alleges that election officials at twelve of Magoffin County's fourteen precincts failed to comply with the voter identification and signature procedures mandated by KRS 117.225.[15] Evidence

---

[15] KRS 117.225(1) provides as follows:

> Any person desiring to vote on election day shall give his name and address to the clerk of the election. If the person's name is listed on the precinct list furnished by the State Board of Elections as provided in KRS 117.025 and if no challenge is made, he shall sign his name on the precinct list in the space opposite his printed name. The voter's signature shall constitute his verification that he is a properly registered and qualified voter. The voter shall then retire alone to cast his vote on the voting machine. The county board of elections may provide to each precinct the original registration form of each voter entitled to vote in

34

presented at trial supported Montgomery's contention that at least some violations occurred, and to varying degrees the trial court found in his favor on these issues.

### B. Failure of Election Officials to Note Confirmation of Voter Identity

Montgomery also presented evidence showing that election officials at the Flat Fork precinct in several instances failed to note on the precinct voter roster the method used to confirm the identity of the voter as required by KRS 117.227.[16] The trial court found that KRS 117.227 had been violated by the failure of some precinct official to sign the precinct voter roster and their failure to note the means used to confirm the voter's identity. The trial court's finding in that regard was plainly supported by substantial evidence.

### C. Interference with Election Observers

Finally, Montgomery offered evidence an election official at the Flat Fork precinct may have improperly interfered with efforts of Republican challenger Stephanie Jo Montgomery to observe voting at Flat Fork, and with investigators from the Kentucky Attorney General's office assigned to observe the Magoffin

---

that precinct. These forms shall be used to compare signatures in those precincts to which the forms are provided.

[16] KRS 117.227 provides as follows:

Election officers shall confirm the identity of each voter by personal acquaintance or by a document, such as a motor vehicle operator's license, Social Security card, any identification card that has been issued by the county and which has been approved in writing by the State Board of Elections, any identification card with picture and signature, any United States government-issued identification card, any Kentucky state government issued identification card with picture, or credit card. The election officer confirming the identity shall sign the precinct voter roster and list the method of identification.

County election. The trial court's findings of fact failed to confirm Montgomery's allegation.

### D. *Failure to Follow Voter Assistance Requirements*

Although not specifically set forth in his petition, Montgomery asserted at trial that on several occasions the Democratic Party precinct judge at the Flat Fork precinct and at the in-house voting at the courthouse, assisted voters without being asked to, and did so in the absence of the Republican Party judge. KRS 117.255(2) authorizes assistance to a voter only in response to the voter's request given under oath and upon completion of the statutorily-authorized voter assistance form. The statutory protocol also requires the precinct judges from both parties to be present at the voting machine to render the requested assistance. KRS 117.255(3). Montgomery's evidence circumstantially raised the specter that the Democratic Party judge was illegally interjecting herself into the voting booth to influence voters' ballot choices, which if true, is obviously a violation of election standards and voter privacy. The trial court found that at Flat Fork and three other precincts, assistance was rendered to an unspecified number of voters without the required signed voter assistance forms. That finding is supported by substantial evidence.

### E. *Summary*

Based upon his evidence of the foregoing allegations, Montgomery argued that all of the votes cast at the Flat Fork precinct should be discarded. Although the trial court found that election officers at the Flat Fork precinct

failed to comply with statutory protocols, it nonetheless concluded that these irregularities "were insufficient to cause the entirety of the vote in that precinct to be disregarded."

We agree that the failure of election officials to sign the precinct voter roster and to conscientiously note the method by which each voter's identity was confirmed violated KRS 117.227. While the violation is a serious matter, it does not establish the illegality of any votes. It is significant that, despite the ease with which any of the affected voters could have been located, none of the voters whose identity confirmation was not properly noted were called as witnesses to confirm or refute the implication that their vote was stolen by an imposter. Reviewing an analogous situation in *Skain v. Milward*, our predecessor court held:

> In every election . . . there will be some illegal registrations and some illegal voting, but the percentage of illegality here as compared with the total vote is too small to affect the result. It is not shown for whom the illegal votes were cast, and without this it cannot be known that contestants were prejudiced thereby. An illegal voter may be required to say how he voted, and it may be that contestees' majority would be that much larger if none of these men had voted.

127 S.W. 773, 778 (Ky. 1910) (citing *Combs v. Combs*, 97 S.W. 1127 (Ky. 1906) and *Scholl v. Bell*, 102 S.W. 248 (Ky. 1907)). *See Anderson v. Likens*, 47 S.W. 867 (Ky. 1898) (clerk's failure to sign ballot book did not render votes illegal).

These authorities persuade us that Montgomery's evidence failed to reach the high threshold required to set aside the votes of the entire Flat Fork precinct. Where no vote was shown to have been improperly cast, we must

37

agree with the trial court's conclusion and the Court of Appeals' opinion that the failure of election officers to follow the statutory directives shown by Montgomery is, alone, insufficient cause to cast out all of the votes in the precinct and, thereby, disfranchise the demonstrably valid votes of those who had no control over the diligence with which election officers performed their duties.

## VIII.    DISPOSITION

Based upon the election irregularities coupled with the "narrow margin of victory," the trial court concluded that the election under review was the result of "fraud and bribery" such that "neither contestant nor contestee can be judged to have been fairly elected." Consequently, it nullified the election and deemed the office of Magoffin County judge executive to be vacant.

The standard for doing so is provided by KRS 120.165(4):

> If it appears from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be judged to have been fairly elected, the Circuit Court, or an appellate court, on appeal, may adjudge that there has been no election.

Thus, "[i]f the number of [invalid ballots] would be sufficient to change the result if they had been cast for the minority, then the election should be set aside upon the ground that it could not be determined with certainty that the result . . . represented the will of the majority." *McClendon v. Hodges*, 272 S.W.3d 188, 191 (Ky. 2008) (citing *Lakes v. Estridge*, 172 S.W.2d 454, 456 (Ky.

1943), quoting *Wallbrecht v. Ingram,* 175 S.W. 1022, 1028 (Ky. 1915)).

However,

> [i]f it can reasonably be done, a court should uphold the validity of an election, and not set it aside for light and trivial causes, and where there has been fraud, intimidations, bribery, illegalities, and irregularities, and the results of such sinister influences can be eliminated, and the result clearly ascertained between the legal voters, it is the duty of the court to do so, and to sustain the election, but, if the fraud, intimidation, bribery, irregularities, and illegalities are such, that the court cannot with reasonable certainty determine who has received a majority of the legal votes, the election should be set aside, and a candidate cannot be declared a victor, unless he can be shown to have received a majority or plurality of the legal votes cast at the election.

*Hendrickson v. Coign,* 200 S.W.2d 905, 907 (Ky. 1947) (quoting *Marilla v. Ratterman,* 273 S.W. 69, 74 (Ky. 1925)). And "[t]he established rule is that where, after giving the evidence of fraud (or irregularities) its fullest effect, and fraudulent or illegal votes may be eliminated, and *the result of the election be fairly ascertained from votes which were regular or untainted,* the court should not go to the extreme of declaring the election void." *McClendon,* 272 S.W.3d at 191-192 (quoting *Beauchamp v. Willis,* 189 S.W.2d 938, 941 (Ky. 1945), adding emphasis).

And we again emphasize that "[t]he burden of proof is on the contestant to show such fraud, intimidation, bribery, or violence in the conduct of the election that neither the contestant nor contestee can be adjudged to have been fairly elected. These things are not presumed, but it must be affirmatively shown, not only that they existed, but that they affected the result to such an extent that it cannot be reasonably determined who was elected." *Skain,* 127

39

S.W. at 778 (citations omitted). *See also Hall v. Martin*, 208 S.W. 417, 419 (Ky. 1919) (An election should not be voided unless the evidence points "unerringly to the establishment of the invalidating facts."); *Upton v. Knuckles*, 470 S.W.2d 822, 827 (Ky. 1971) ("[I]t is only in the most flagrant kind of case that voters will be disfranchised for illegal acts of the election officials.").

Upon the application of the above standards we are persuaded that Montgomery failed to meet the burden of affirmatively demonstrating such fraud, intimidation, bribery, or violence in the conduct of the election that Hardin cannot be adjudged to have been fairly elected.

As demonstrated above, once the trial court's factual findings are adjusted to exclude its clearly erroneous determinations, it is seen that the instances of irregularities and malfeasance that were shown are simply not enough to demonstrate that those factors are sufficient to negate Hardin's twenty-eight vote margin of victory.

For all of the testimony concerning alleged irregularities which occurred at the various voting precincts on election day the evidence allows only one vote to be deducted from Hardin's total. And while certain of the election officials indeed failed to meet the standards expected by citizens, the rule prevails that courts are reluctant "to disfranchise voters because of irregularities or derelictions on the part of election officials . . . ." *Arnett*, 425 S.W.2d at 553. We will of course do so "if the departures from legal requirements are so broad as to taint the election or so as to require rejection of the part affected." *Id.* (citing *Pickard v. Jones*, 243 S.W.2d 46, 49 (Ky. 1951)). Here, the irregularities

40

identified by Montgomery are not so broad and pervasive so as to require the rejection of the entirety of the vote of the Flat Fork precinct or any other precinct.

Similarly, Montgomery has failed to identify by affirmative evidence any absentee ballot which should be deducted from Hardin's total or added to his. And as discussed, the various irregularities in the issuing of the absentee ballots, the in-house voting process, and the absentee vote counting process, amounted to violations of *directory* standards as opposed to *mandatory* standards of such a nature and magnitude which require the entirety of the absentee ballots to be thrown out.

As to the alleged vote buying which occurred on election day, only the vote of Jerry Adams was shown with sufficient evidence to have been purchased. Throwing out that illegal vote reduces Hardin's lead to twenty-seven. And as explained, Montgomery failed to demonstrate that the graveling and other road, paving, and drainage work which occurred near in time to the election was related to vote-buying as opposed to routine work which would have been undertaken in accordance with normal maintenance needs in any event.

Montgomery failed to convincingly establish through his handwriting expert any adjustments to the vote counts which may fairly be made; and while it was conceded by Appellants' expert that as many as ten signatures were suspect, the identification of those signatures accomplishes only half of the task. The unfinished half of the task being to corral the voters associated with

41

those questionable signatures into the election contest proceeding and make a record of how it transpired that questionable signatures found their way into the election process, and if there were indeed imposters behind the signatures, identifying who they were, who was behind it, and who the imposters cast their votes for so that appropriate adjustments to the vote tallies may be made. As the record stands, however, we have only the bare finding that some voter signatures are questionable. That information alone does not equip the Court to make vote adjustments because there is no reason to suppose that any or all of the votes cast under suspicious signatures were for Hardin; it is not beyond plausibility that some or all of the alleged imposters, if there were any, cast votes for Montgomery.

In summary, we agree with the assessment of the dissenting judge in the Court of Appeals decision: the evidence presented "is woefully short of that required to warrant judicial intervention and voiding this election."

## IX. CONCLUSION

Public confidence in free and fair elections is vital to the body politic of every community in this state and this nation. While corruption in the casting and counting of votes, as was alleged in this case, certainly undermines the integrity of election results, it is not the only threat that we must guard against. Equally corrosive to the public's trust in fair elections is the destabilization of election results that would occur if we cast aside election results for trivial reasons or unsubstantiated accusations. We avoid both threats and preserve public confidence in elections by imposing a rigid

42

statutory framework to regulate voting and the counting of votes before the results are determined, and by maintaining a judicial policy that demands persuasive evidence of corruption to challenge the integrity of election results after the votes are counted.

A broad spectrum of election irregularities in this case aroused reasonable suspicions that warranted an investigation to determine the facts. But the accumulated evidence failed to establish improprieties sufficient to impact the overall validity of the results. The contestant failed to meet the burden of affirmatively proving fraud, intimidation, bribery, or violence in the conduct of the election such that the incumbent cannot be adjudged to have been unfairly elected. Consequently, we are bound to sustain the results as certified by the Board of elections. We therefore reverse the opinion of the Court of Appeals, and remand this case to the Magoffin Circuit Court with directions to dismiss the election contest petition, to enter an order authorizing Charles Hardin, M.D., to assume the seat of Magoffin County judge executive to which he was elected, and for such other proceedings as necessary to implement the mandate of this decision.

All sitting. All concur.

COUNSEL FOR CHARLES HARDIN, M.D.:

Eldred E. Adams Jr
Adams & Adams

James Lee Deckard
Hurt, Deckard & May, PLLC


COUNSEL FOR MAGOFFIN COUNTY BOARD OF ELECTIONS, RENEE
ARNETT-SHEPHERD, MAGOFFIN COUNTY CLERK, CARSON MONTGOMERY,
IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE MAGOFFIN COUNTY
BOARD OF ELECTIONS, SUSIE SALYER, IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE MAGOFFIN COUNTY BOARD OF
ELECTIONS, AND JUSTIN WILLIAMS, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE MAGOFFIN COUNTY BOARD OF ELECTIONS:

Jason Michael Nemes
Matthew Cory Williams
Fultz Maddox Dickens, PLC

COUNSEL FOR JOHN MONTGOMERY:
Gordon B. Long
Gordon B. Long Law Office, P.S.C.

They are the means provided by law for the expression of the will of the people. To set them aside unnecessarily would be to destroy that confidence in them which is essential. If often set aside they would be less attended; for the voters would await the next chance, and the election, instead of settling things, would be only the starting point for new controversies. Elections must be free and equal; but they cannot be free and equal unless supported by public confidence. When once the notion prevails that confidence cannot be placed in the stability of elections, their power and usefulness is destroyed.

135 S.W. 434, 439 (Ky. 1911) (quoting *Skain v. Milward*, 127 S.W. 773 (Ky. 1910)).

The application of these stringent standards, along with the other authorities we cite herein, placed the burden upon Montgomery to prove: 1) that the improprieties he alleged actually occurred *and* were significant enough to have affected the result; or 2) that the election was so corrupted by fraud, intimidation, and bribery that the vote tallies are substantively unreliable. For the reasons explained below, we are persuaded that Montgomery made neither showing, and the trial court and Court of Appeals were in error to conclude otherwise.

### III. LACK OF COMPLIANCE WITH STATUTORY TIMING REQUIREMENTS AND SPECIFICITY OF PLEADINGS

Appellants first contend that the trial court erred by permitting an extended period of time for proof-taking in violation of KRS 120.165(2),[8] and

---

[8] KRS 120.165(2) provides as follows:

> The evidence in chief for the contestant shall be completed within thirty (30) days after service of summons; the evidence for the contestee shall be completed within twenty-five (25) days after filing of answer, and